**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ANDREW CONSTANTINOU,<br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Respondent. | | CIVIL ACTION NO.<br>3:16-CV-608 (JCH)<br><br><br>NOVEMBER 17, 2017 |

**RULING RE: MOTION TO AMEND (DOC. NO. 41) AND MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 (DOC. NO. 27)**

**I.    INTRODUCTION**

The case comes before the court pursuant to a Motion to Vacate, Set Aside, or Correct Sentence under title 28, section 2255 of the United States Code ("section 2255").  See generally Motion to Vacate, Set Aside or Correct Sentence ("Mot. to Vacate") (Doc. No. 25).

Constantinou filed an initial Motion to Vacate, Set Aside or Correct Sentence (Doc. No. 1) without the assistance of counsel on March 16, 2016.  Subsequently, this court appointed counsel to represent Constantinou on April 19, 2016 (Doc. No. 4), and then appointed new counsel on June 17, 2016 (Doc. No. 11).  Six months later, on December 15, 2017, Constantinou's appointed counsel filed an amended Motion to Vacate, Set Aside or Correct Sentence, which is currently pending before this court. See generally Mot. to Vacate (Doc. No. 25).

Subsequently, six months after the Amended Petition was filed, counsel for Constantinou filed a Motion to Amend the Amended Petition ("Mot. to Am.") (Doc. No. 41).  For the reasons set forth below, Constantinou's Motion to Amend (Doc. No. 41) and Motion to Vacate, Set Aside or Correct Sentence (Doc. No. 25) are both **DENIED**.

## II. MOTION TO AMEND (DOC. NO. 41)

In Constantinou's two-page Motion to Amend, Constantinou requests the opportunity to add two claims to his pending Motion to Vacate. Mot. to Am. (Doc. No. 41). First, Constantinou proposes adding a claim that "trial counsel was ineffective for failing adequately to review the plea agreement with Petitioner and accurately apprise Petitioner of the risks of going to trial." Mot. to Am. at 1. Second, counsel expresses a tentative interest in amending the petition to add an argument that, pursuant to United States v. Bouchard, 828 F.3d 116 (2d Cir. 2016), Constantinou's conviction should be reversed and, furthermore, that appellate counsel was ineffective for failing to make this argument on appeal. Mot. to Am. at 1.

In support of his Motion to Amend, Constantinou only asserts that "[t]he interests of justice require that these claims be permitted now . . . as the undersigned's research and investigation has continued parallel to discussions with Petitioner." Mot. to Am. at 1. However, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), title 28, section 2244(d)(1) of the United States Code imposes rigid deadlines on the filing of habeas petitions, which this court cannot choose to ignore. As the government points out in its Opposition to the Motion to Amend, this deadline begins to run from the latest of "the date on which the judgment of convictions becomes final;" "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;" or "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f).

In this case, Constantinou has not asserted a newly recognized right or newly discovered facts as the basis for his habeas petition. Therefore, the AEDPA "clock" began to run on the date on which the judgment of conviction became final. Because Constantinou's appeal was denied by the Second Circuit on January 22, 2016, and because he did not file a petition for certiorari with the Supreme Court, Constantinou's judgment of conviction became final on April 21, 2016, when his 90-day period to file an appeal with the Supreme Court expired. <u>See</u> <u>Clay v. United States</u>, 537 U.S. 522, 525 (2003) (holding that if a petitioner does not file an appeal with the Supreme Court, "a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction"). Therefore, Constantinou's one-year period for filing his habeas petition expired on April 21, 2017. In light of the fact that Constantinou's one-year filing period expired on April 21, 2017, new claims in an amended petition are time-barred by AEDPA.

Finally, the proposed claims do not "relate back" to the original pleading such that they would not be time-barred. <u>See</u> Federal Rule of Civil Procedure 15(c)(1). Amendments "relate back" only when they "assert[ ] a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." <u>Id.</u> With respect to habeas petitions in particular, the Supreme Court has clarified that "conduct, transaction, or occurrence" cannot be construed so broadly as to cover "petitioner's trial, conviction, or sentence," for such a liberal interpretation would mean that "virtually any new claim introduced in an amended petition will relate back, for federal habeas claims, by their very nature, challenge the constitutionality of a conviction or sentence, and commonly attack proceedings anterior thereto." <u>Mayle v. Felix</u>, 545 U.S. 644, 656–57

(2005).  Constantinou's proposed amendments would add two claims which are entirely

distinct from those raised in his timely-filed petition.  The Motion to Amend is therefore

**DENIED**.

### III.  MOTION TO VACATE, AMEND OR CORRECT THE SENTENCE (DOC. NO. 25)

A.  <u>Background</u>

Constantinou was indicted on February 14, 2013, for conspiracy to commit wire,

mail and/or bank fraud from approximately September 2006, to November 2008.  This

court has previously described the charges and evidence against Constantinou as

follows:

> The Second Superseding Indictment alleged that Constantinou, along with a number of known and unknown co-conspirators, conspired to unlawfully enrich himself by obtaining millions of dollars in real estate mortgages through the use of, among other things, materially false loan applications, loan documents, and HUD-1 forms, and to conceal the scheme from others.  Second Superseding Indictment ¶ 13.  Constantinou's alleged role in the conspiracy was to act as the loan officer for multiple fraudulent transactions.  <u>Id.</u> at ¶ 20.  In so acting, the Second Superseding Indictment alleged, Constantinou made, or caused to be made, materially false statements in documentation sent to Lenders to assist in obtaining financing to purchase properties.  <u>Id.</u>  As further part of the conspiracy, Constantinou allegedly received funds at or shortly after closings that were not disclosed to the Lenders, and referred mortgage applications in the scheme to an unindicted co-conspirator who would act as mortgage broker on the applications and, in some instances, pay kickbacks or referral fees to Constantinou.  <u>Id.</u> at ¶¶ 26, 27.
>
> At trial, the government presented the following evidence against Constantinou: (1) a demonstrative showing that Andrew Constantinou was the loan officer for eight fraudulent transactions; (2) testimony from cooperating witnesses Joseph Levitin and Jeffrey Weisman, Constantinou's former supervisor at GMAC Jack Murphy, former GMAC processing department supervisor Carolyn Duffy, lender representatives

> Lanisa Jenkins and Wendy Tucci, and law enforcement
> witnesses as to Constantinou's knowledge that each of the
> fraudulent loans associated with Constantinou were, in fact,
> fraudulent; (3) fake leases, schedules of real estate owned,
> and numerous contract addenda used in the course of the
> conspiracy; (4) and bank statements showing Constantinou's
> receipt of kickbacks from unindicted co-conspirator Richard
> Sabrowske for referring loans related to co-conspirators'
> purchase of two properties to Sabrowske, kickbacks that were
> funneled through Constantinou's daughter's bank account
> and the account of a shell company Constantinou controlled.

United States v. Constantinou, No. 3:11-CR-192 (JCH), 2014 WL 4385435, at *1. At trial, Constantinou did not argue that no mortgage fraud occurred, but rather argued that he, Constantinou, was not a party to the mortgage fraud. Mot. to Vacate (Doc. No. 25) at 2.

On April 18, 2014, a jury convicted Constantinou as charged. On December 16, 2014, this court sentenced Constantinou to 60 months' imprisonment, five years of supervised release, and restitution in the amount of $2,105,277.50. He was represented at trial by Attorney Hubert Santos.

Constantinou appealed his conviction and his sentence, and that appeal was denied by the Second Circuit on January 22, 2016. Constantinou was represented on appeal by Attorney Norm Pattis.

In the pending Motion to Vacate, Constantinou requests a new trial pursuant to section 2255. Constantinou raises sixteen claims of ineffective assistance of trial counsel and one claim of ineffective assistance of appellate counsel.[1]

---

[1] Although the Petition contains eighteen numbered claims, there is no "count fifteen." See Mot. to Vacate (Doc. No. 25) at 12 (going from count fourteen to count sixteen).

B.   Legal Standards

1.   Section 2255 Petition

Section 2255 is the vehicle for collateral challenges to federal convictions,

otherwise known as the federal habeas statute.  "Because requests for habeas corpus

relief are in tension with society's strong interest in the finality of criminal convictions,

the courts have established rules that make it more difficult for a defendant to upset a

conviction by collateral, as opposed to direct, attack."  Ciak v. United States, 59 F.3d

296, 301 (2d Cir.1995), abrogated on other grounds by Mickens v. Taylor, 535 U.S. 162

(2002).  "[C]ollateral attack on a final judgment in a criminal case is generally available

under [section] 2255 only for a constitutional error, a lack of jurisdiction in the

sentencing court, or an error of law or fact that constitutes a fundamental defect which

inherently results in complete miscarriage of justice."  Graziano v. United States, 83

F.3d 587, 589–90 (2d Cir. 1996) (quoting United States v. Bokun, 73 F.3d 8, 12 (2d Cir.

1995)) (internal quotation marks omitted).  In a section 2255 motion, the burden is on

the petitioner to prove by a preponderance of the evidence his entitlement to relief.  See

Napoli v. United States, 45 F.3d 680, 683 (2d Cir. 1995); Gotti v. United States, 622 F.

Supp. 2d 87, 91 (S.D.N.Y. 2009).

In deciding a section 2255 motion, the court must hold a hearing, "unless the

motion and the files and records of the case conclusively show that the prisoner is

entitled to no relief."  28 U.S.C. § 2255(b).  However, a petitioner is not automatically

entitled to a hearing, and no hearing is required where a petitioner's "allegations are

'vague, conclusory, or palpably incredible.'"  Gonzalez v. United States, 722 F.3d 118,

130 (2d Cir. 2013) (quoting Machibroda v. United States, 368 U.S. 487, 495 (1962));

see also United States v. Aiello, 814 F.2d 109, 113–14 (2d Cir. 1987) ("Airy generalities,

conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing."). "The procedure for determining whether a hearing is necessary is in part analogous to, but in part different from, a summary judgment proceeding." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009). "To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief." Gonzalez, 722 F.3d at 131. For ineffective assistance of counsel claims, the threshold evaluation in determining the necessity for a hearing is whether the petitioner's claim is "plausible," not whether that claim "will necessarily succeed." Puglisi, 586 F.3d at 213 (quoting Armienti v. United States, 234 F.3d 820, 823 (2d Cir. 2000)).

### 2. Ineffective Assistance of Counsel

Ineffective assistance of counsel is "[o]ne claim that may appropriately be raised for the first time in a [section] 2255 motion, 'whether or not the petitioner could have raised the claim on direct appeal.'" Harrington v. United States, 689 F.3d 124, 129 (2d Cir. 2012) (quoting Massaro v. United States, 538 U.S. 500, 504 (2003)). A petitioner claiming ineffective assistance of counsel "must show that (1) counsel's performance was objectively deficient, and (2) petitioner was actually prejudiced as a result." Harrington v. United States, 689 F.3d at 129; see also Strickland v. Washington, 466 U.S. 668, 687–88 (1984).

The Second Circuit has described the petitioner's burden as "a heavy one because, at the first step of analysis, [a court] 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Harrington v. United States, 689 F.3d at 129 (quoting Raysor v. United States, 647 F.3d

7

491, 495 (2d Cir. 2011)). "The determinative question at this step is not whether counsel 'deviated from best practices or most common custom,' but whether his 'representation amounted to incompetence under prevailing professional norms.'" Id. at 129–30 (quoting Harrington v. Richter, 562 U.S. 86, 88 (2011)). The standard for evaluating the adequacy of counsel's representation is "a most deferential one," Harrington v. Richter, 562 U.S. at 105, since "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," Strickland, 466 U.S. at 690.

To show the requisite prejudice, at the second step, a petitioner must show "a reasonable probability that his reliance on counsel's ineffective assistance affected the outcome of the proceedings." Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

C.    Discussion

In his Motion to Vacate, Constantinou argues that trial counsel was ineffective for: (1) failing to call witnesses at trial and at sentencing to testify that Constantinou was not present at a closing that took place on December 29, 2006; (2) failing to call witnesses to testify that Constantinou's appraisals were not inflated; (3) failing to elicit, through cross-examination or calling witnesses, that Constantinou was cleared of wrongdoing in an internal audit at GMAC; (4) failing to call an expert witness on loan processing; (5) failing to elicit specific testimony from defense witness Eric Aydar; (6) failing to argue effectively in closing argument; (7) failing to present evidence that GMAC defended the legitimacy of their loans against accusations by Freddie Mac; (8)

failing to present evidence that GMAC participated in legitimate agreements with outside lenders; (9) failing to present evidence that Levitin stopped working with Constantinou because he refused to work with a specific appraiser, in contrast to Levitin's testimony that Constantinou "was too expensive"; (10) failing "timely to secure" documentary evidence that Levitin continued to work as a Realtor after he was convicted of fraud; (11) failing to call witnesses to testify that Constantinou refused to close on a fraudulent loan sought by Reginald Powell; and (12) failing to call or question witnesses about Levitin's multiple conspiracies. See generally Mot. to Vacate (Doc. No. 25). In addition, Constantinou argues that his conviction is unlawful because the Government's proof was of multiple conspiracies, rather than the single conspiracy charged in the Indictment. Id. at 14. Finally, Constantinou argues that, if he is estopped from making this claim for failure to raise on direct appeal, then appellate counsel was ineffective for failing to raise the multiple-conspiracies argument on direct appeal. Id.[2]

As a threshold matter, the government argues that all of Constantinou's arguments are "cursory and unsupported" and are, as such, "effectively waived." Government's Response to Order to Show Cause ("Response") (Doc. No. 37) at 5. However, as Constantinou accurately observes in his Reply to the government's Response, the government's argument is based on a standard applicable to appellate briefs, not section 2255 motions. See Response at 5 (citing Norton v. Sam's Club et al., 145 F.3d 114, 117 (2d Cir. 1998), which addresses the standard for appellate briefing).

---

[2] Constantinou's Motion to Vacate organized his claims differently than the court has done here, most notably by raising sixteen separately-numbered claims of ineffective assistance of trial counsel as opposed to the twelve listed in this Ruling. Although the court has structured the arguments somewhat differently for the sake of clarity and efficiency, the court nevertheless addresses the substance of all sixteen ineffective-assistance-of-trial-counsel claims.

Contrary to the government's position, according to the Local Rule of Civil Procedure 8, Constantinou need only state a "short and plain statement of the claim made and the relief sought."[3] The Second Circuit has held that motions pursuant to section 2255 need only "identify available sources of relevant evidence rather than obtain it as in civil cases," given that there is no pre-motion discovery under section 2255. Puglisi, 586 F.3d at 213–14. Constantinou's Petition is not, therefore, procedurally deficient. For the purposes of this Ruling, the court takes all of Constantinou's factual allegations as true, except to the extent that they are clearly contradicted by the trial record, a trial which was conducted before this court. See id. at 214 ("[A] district court need not assume the credibility of factual assertions, as it would in civil cases, where the assertions are contradicted by the record in the underlying proceeding.").

That being said, distinct from the issue of evidentiary support, Constantinou's claims do suffer on the merits from the general lack of detailed factual arguments. Throughout the Petition, Constantinou broadly asserts that trial counsel should have called certain witnesses or elicited certain testimony, for example, but generally fails to specify how or why counsel's performance was objectively unreasonable or affected the outcome of the trial. In other words, the court agrees with the government's characterization of Constantinou's Motion to Vacate as "rife with speculation, unsubstantiated assertions, and conclusory statements." Response at 4. In sum, the fact that Constantinou is not obligated to supply the court with affidavits or other

---

[3] The court notes that in some federal districts and circuits, motions pursuant to section 2255 must be supported by affidavits. See, e.g., Kafo v. United States, 467 F.3d 1063, 1067 (7th Cir. 2006) ("It is the rule of this Court that in order for a hearing to be granted, the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions." (quoting Prewitt v. United States, 83 F.3d 812, 819 (7th Cir. 1996)). However, that is not the rule in this circuit or district.

evidence at this stage in the proceedings does not exempt him from providing detailed facts plausibly alleging that he is entitled to relief.

The court now turns to the substance of Constantinou's claims.

### 1. Failure to Call Witnesses to Testify that Constantinou Was not Present at the December 29, 2006 Closing

At trial, Joseph Levitin testified that Constantinou was present at a closing for three properties—270 Davenport, 125 Spring Street, and 535 East Street—at which closing co-conspirator Attorney Genevieve Salvatore cut checks to pay multiple conspirators, including the buyer, Jacques Kelly.  See Mot. to Vacate at 3–4; Trial Transcript ("Tr.") at 630–34.  In his Motion to Vacate, Constantinou describes this testimony as "powerful and rare direct evidence of [Constantinou's] knowledge and intent."  Mot. to Vacate at 4.  Constantinou asserts that, contrary to Levitin's testimony, he was not present at that closing.  Constantinou argues that trial counsel was ineffective for failing to call Marcie Berson, Yury Berson, or Ronald Hutchison, all of whom were present at the closing and all of whom "would have testified that Mr. Constantinou was not present."  Id. at 12–13.

Assuming, for the sake of argument, that Constantinou was not present at the meeting, and further assuming that his suggested witnesses would have been available for trial and would have testified as he asserts, Constantinou has not plausibly pled either that trial counsel's performance was deficient or that, if the jury knew he was not present, there is a reasonable probability that the outcome of his trial would have been different.

With respect to the performance prong of the ineffective-assistance standard, Constantinou has not made any argument as to why trial counsel's performance "fell

below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688. Constantinou asserts that trial counsel should have "called other witnesses"—including Marcie Berson, Yury Berson, and Ronald Hutchinson—to impeach Levitin's testimony. Mot. to Vacate at 5, 12–13. However, "counsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional judgment.'" <u>United States v. Best</u>, 219 F.3d 192, 201 (2d Cir. 2000) (quoting <u>United States v. Schmidt</u>, 105 F.3d 82, 90 (2d Cir. 1997)); <u>see</u> <u>United States v. Smith</u>, 198 F.3d 377, 386 (2d Cir. 1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." (internal quotation marks omitted)). Thus, Constantinou bears a heavy burden to show that trial counsel's conduct fell below an objective reasonableness standard.

Constantinou has failed to make any argument as to why trial counsel's decisions on this subject fell below an objective standard of reasonableness. Constantinou has not asserted that the three witnesses he suggested were available and willing to testify as Constantinou describes at the time of trial, or that trial counsel knew, or should have known, that this was the case. Even assuming that all three of the witnesses that Constantinou lists would have testified as he describes if called, it is hardly unreasonable for trial counsel to decide not to call as defense witnesses individuals who, among other things, may simply not have been credible witnesses given that their knowledge with respect to Constantinou's presence at the closing in question would be directly tied to their participation in mortgage fraud.

Furthermore, trial counsel did, in fact, offer evidence that tended to show that Constantinou was not present at the December 29, 2006 closing: Constantinou himself testified that he was not at that closing, <u>see</u> Tr. at 1709–10, and trial counsel also admitted documentary evidence tending to show that Constantinou was not there. Although Constantinou acknowledges that his own testimony rebutted Levitin's on this issue, he erroneously asserts that his testimony was the only rebuttal evidence submitted by the defense with respect to the closing. Mot. to Vacate at 5. To the contrary, trial counsel also admitted documents from the December 29, 2006 closing that tended to show that Constantinou was not present, documentary evidence that was central to the Motion for Judgment of Acquittal, Mistrial, and New Trial (Doc. No. 569) filed by trial counsel after the jury returned their verdict. <u>See also</u> Ruling re: Defendant's Motion for Judgment of Acquittal, Mistrial, and New Trial (Doc. No. 608) at 6 (discussing "documentary evidence in the record" which "suggested that Constantinou was not present at the closing of 270 Davenport, contrary to Levitin's testimony that he was present"). Constantinou has made no effort to explain why testimony by co-conspirators who were at the meeting would have been more powerful than this documentary evidence, or why trial counsel's decision to rely on Constantinou's testimony and documentary evidence was objectively unreasonable.

Given the presumption that trial counsel's decisions with respect to calling witnesses were reasonable, the absence of any argument as to why this case is exceptional, and the fact that trial counsel did present both testimony and documentary evidence on this matter, Constantinou has failed to plausibly allege that trial counsel acted objectively unreasonably with respect to the December 29, 2006 closing.

With respect to the prejudice prong of the <u>Strickland</u> analysis, Constantinou alleges that he was prejudiced at both trial and sentencing by counsel's failure to call witnesses to testify that he was not present at the December 29, 2006 closing.

Constantinou's argument that he was prejudiced at trial is implausible in light of the overwhelming evidence of guilt that was presented to the jury. Two co-conspirators, Levitin and Attorney Jeffrey Weisman, testified that Constantinou was a willing participant in the conspiracy, and Levitin in particular gave detailed testimony of Constantinou's involvement. The government presented documentary evidence showing that Constantinou was the loan officer on eight fraudulent mortgages, and referred an additional thirteen fraudulent mortgages to unindicted co-conspirator Richard Sabrowske. The government also established through documentary evidence and the testimony of FBI forensic accountant Ben Almodovar that Constantinou received kickbacks from Sabrowske for at least two of the fraudulent mortgages that he referred, funneled those kickbacks through his daughter's bank account and an account set up under a fake name, and used the money to pay his personal credit card bills. In addition, the jury heard testimony from two of Constantinou's former supervisors that they had identified troubling patterns in Constantinou's loan portfolio, and that, when they informed Constantinou that his loans would be audited for the foreseeable future, Constantinou resigned.[4] In light of the substantial evidence of Constantinou's guilt, even assuming that the witnesses Constantinou suggests would have testified, would

_____

[4] Constantinou also argues in his Motion to Vacate that the internal audit at GMAC concluded that he was not guilty of any wrongdoing. <u>See</u> <u>infra</u> Section III(C)(3). However, the outcome of the audit does not alter the fact that GMAC identified suspicious patterns in Constantinou's work or the fact that, when alerted to those suspicions, Constantinou resigned.

have given the testimony he asserts, and would have been credited by the jury,

Constantinou has still failed to plausibly allege prejudice. In short, contrary to

Constantinou's assertion that Levitin's testimony about Constantinou's presence at the

closing was "powerful and rare direct evidence" of his culpability, there was a wealth of

both direct and circumstantial evidence upon which the jury could have based its

decision.

In addition, Constantinou asserts that "Levitin's credibility generally was critical to

the Government's case against Mr. Constantinou," and that calling other witnesses to

testify that Constantinou was not present "would have materially affected Joseph

Levitin's credibility and substantially weakened the Government's case against Mr.

Constantinou." Mot. to Vacate at 5. However, as described above, the government's

evidence against Constantinou at trial included testimony by multiple co-conspirators,

Constantinou's supervisors at GMAC, and an FBI forensic accountant, in addition to a

wealth of documentary evidence. Although Levitin's testimony was, without question,

helpful to the government's case, the government by no means relied solely on that

evidence.

Furthermore, Constantinou has failed to plausibly allege that Levitin's testimony

as a whole would be undermined by impeachment on the question of whether

Constantinou was at the closing in question. This can hardly be presumed given that

much of Levitin's testimony with respect to Constantinou's intentional participation in the

conspiracy was corroborated by documentary evidence and the testimony of other

witnesses. For example, Levitin testified that he questioned Sabrowske about the

closing costs on his loans, and Sabrowske told Levitin that "he had to kickback a point,"

or one percent of the loan amount, to Constantinou.  Tr. at 640.  Documentary evidence

and the testimony of forensic accountant Almodovar corroborated Levitin's testimony

that Constantinou was receiving kickbacks from Sabrowske for referring fraudulent

loans.  In short, even if Levitin was impeached on the factual question of whether

Constantinou was present at the closing, the court is skeptical that the jury would have

discounted all of Levitin's testimony as a result.

With respect to his prejudice-at-sentencing argument, Constantinou argues that,

if Levitin's testimony had been effectively impeached on this issue, Constantinou would

not have received an enhancement for Obstruction of Justice under the United States

Sentencing Guidelines.  See U.S.S.G. § 3C1.1.  This prejudice argument is defective as

well, because the enhancement for Obstruction of Justice was irrelevant to the court's

sentencing decision, as the court emphasized at sentencing:

> I'm aware of [the sentencing guideline range], but I think, as
> in many of the loss-driven guideline calculations, it really
> skews it in a way that the other [non-guidelines] factors are
> much more helpful, particularly nature and circumstance and
> history and characteristics.  So, [the sentence imposed] would
> be my sentence even if the guidelines were to be two, four,
> six levels lower or higher, if I made a mistake on abuse of
> trust, for example, this would still be the appropriate sentence
> after consideration of all of the factors.

Sentencing Transcript at 108.  Given that the guideline range did not form the basis of

Constantinou's sentence, the record clearly shows that Constantinou's argument with

respect to prejudice at sentencing is meritless.

In sum, Constantinou has failed to plausibly allege that counsel acted objectively

unreasonably in failing to call Marcie Berson, Yury Berson, or Hutchinson to testify that

Constantinou was not at the December 29, 2006 closing, and further failed to plausibly

allege that he was prejudiced at either trial or sentencing in the absence of that testimony.

### 2. Failure to Call Additional Witnesses to Testify that Constantinou Did Not Inflate Appraisals

At trial, Levitin testified that the contract price was inflated in all of his dealings with Constantinou, rendering all of the transactions fraudulent. Tr. at 557–58. In his Motion to Vacate, Constantinou asserts that "[t]rial counsel failed to produce any appraiser who worked with Mr. Constantinou, to testify that Mr. Constantinou insisted upon legitimate appraisals." Mot. to Vacate at 6. Constantinou argues that, "[h]ad any such witness been called, Mr. Levitin's testimony would have been seriously undermined." Id. This is an ironic argument, given that trial counsel did, in fact, call an appraiser who worked with Constantinou, Eric Aydar, who did testify that his appraisals were not inflated. See Tr. at 1607–20.[5] By the very terms of Constantinou's Motion, therefore, both his performance and his prejudice claims fail.

However, even liberally construing Constantinou's claim as an argument that counsel should have called additional appraisers, he has still failed to plausibly allege ineffective assistance of counsel on this basis. As noted above, see supra Section III(C)(1), the decision whether to call defense witnesses and which witnesses to call enjoys a presumption of reasonableness. In addition, the only appraiser Constantinou names who trial counsel should have called is Mary Jean Ryan, Aydar's former business partner. See Mot. to Vacate at 12. Yet, it is clear from the trial record that

_____

[5] Constantinou's apparent memory lapse with respect to Aydar seems to have cleared up several pages later, when he argues that trial counsel failed to "properly question defense witness Eric Aydar," whom Constantinou describes as an "appraiser." Mot. to Vacate at 10.

Ryan was unavailable at the time of trial. During Aydar's testimony, the following occurred:

> Defense counsel: And about when did you start an appraisal business with Mary Jean Ryan?
>
> Aydar: I believe sometime [sic] 2003.
>
> Defense counsel: 2003. And do you know where Mary Jean Ryan is today?
>
> Aydar: She's in North Carolina.
>
> Defense counsel: On a personal matter with her mother?
>
> Aydar: Her mother is sick, yeah.

Tr. at 1608. Ryan's own business partner therefore testified that Ryan was unavailable to testify in Connecticut at the time of trial.

Constantinou does not address, much less rebut, the fact that Ryan was out of state with her sick mother at the time of trial, nor does he offer any basis for the court to find that trial counsel nevertheless acted unreasonably in failing to obtain her testimony. In fact, in his own Reply to the government's Response, Constantinou notes that "Mary Jean Ryan is presently out of state and has not responded to our investigator's inquiries," suggesting that Ryan is still unavailable to testify. Reply (Doc. No. 46) at 4. Constantinou has therefore failed to plausibly allege that trial counsel acted objectively unreasonably in failing to call appraiser Mary Jean Ryan or any other appraiser in addition to Eric Aydar.

Constantinou has also failed to plausibly allege that, had Ryan or another appraiser testified, there is a reasonable probability that the outcome of trial would have been different. Even assuming that additional appraisers were available and would have testified as Constantinou asserts, the fact that Constantinou "insisted upon

18

legitimate appraisals" with one or more appraisers would not contradict Levitin's testimony that, in his dealings with Constantinou, all the contracts had inflated prices. Mot. to Vacate at 6. In fact, given that Levitin was, by all accounts, the leader of the mortgage fraud conspiracy, it would be entirely consistent with the government's theory of the case if Constantinou insisted upon legitimate appraisals in all transactions except those involving Levitin. It is therefore far from clear that Levitin's testimony "would have been seriously undermined" if additional appraisers had testified. Id. Constantinou has therefore failed to plausibly allege ineffective assistance of counsel with respect to both the performance and the prejudice prongs.

### 3. Failure to Introduce Evidence that an Internal Audit at GMAC Cleared Constantinou of Wrongdoing

At trial, Constantinou's former supervisor at GMAC, John Murphy, testified that GMAC became suspicious of Constantinou's loans and decided to perform an internal audit on them. Tr. at 258. He also testified that, when he informed Constantinou of this situation, Constantinou resigned a day or two later. Id. at 262. In addition, Carolyn Duffy, the operations manager at GMAC from 1999 to 2010, testified that she personally reviewed Constantinou's loans and identified suspicious patterns, including that the properties were located "within a very close proximity," the parties on the loans were "similar," and "[t]he appraiser and attorney were all similar." Id. at 511–12.

In his Motion to Vacate, Constantinou argues that trial counsel was ineffective for failing to elicit testimony—through cross-examination of Murphy or Duffy, or by calling Michael Tavarozzi, another GMAC employee—that the internal audit conducted by GMAC concluded that Constantinou had not committed any wrongdoing. See Mot. to Vacate at 6–10, 13.

Like his other claims, Constantinou has failed to allege any specific facts which support his claim that the internal audit cleared him of wrongdoing. However, assuming for the sake of argument that this assertion is true, the court is nevertheless not persuaded that Constantinou has plausibly alleged ineffective assistance of counsel with respect to this issue.

First, with respect to the argument that trial counsel was ineffective in his cross examinations of Murphy and Duffy, Constantinou has not offered any basis for the court to find that trial counsel's performance was objectively unreasonable. Decisions about "whether to engage in cross-examination, and if so to what extent and in what matter," Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002) (quoting United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987)), ordinarily fall "within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689. As the Second Circuit has observed, cross-examination decisions are "strategic in nature" and "generally will not support an ineffective assistance claim." Dunham, 313 F.3d at 732.

This case does not present an exception to those general rules. Constantinou has not provided any basis for the court to find that trial counsel was objectively unreasonable for failing to ask directly about the internal audit. Trial counsel did, in fact, cross examine both Murphy and Duffy about the outcome of the internal audit at GMAC. During trial counsel's cross-examination of Murphy, the following occurred:

> Defense counsel:  . . . [S]o an investigation was undertaken, there was an audit, right?
>
> Murphy:  Correct.
>
> Defense counsel:  And at that time, was GMAC FDIC insured? Was it an FDI [sic] insured organization?
>
> Murphy:  We think they were, yes.

Defense counsel: And so as an FDIC insurer, it is your obligation to report any instance of fraud to the FBI, right?

Murphy: I don't know if that's – I don't know if that – that's the case.

Defense counsel: Was Mr. Constantinou referred to the FBI because of these three closings involving Mr. Kelly?

Murphy: Not that I'm aware of.

Tr. at 277–78. During his cross examination of Murphy, therefore, trial counsel raised the inference that, because GMAC did not report Constantinou to the FBI, GMAC had not found any fraud in the audit of his loans. Murphy's testimony also suggests that he was not aware of the outcome of the internal audit.

Similarly, trial counsel cross examined Duffy about the internal audit, and she testified that she did not know what had happened with the audit after she referred it to the fraud department:

Defense counsel: . . . There was some investigation at GMAC concerning loans that Mr. Constantinou was involved with, right?

Duffy: Correct.

Defense counsel: And I think you said you sent it over to the fraud division.

Duffy: Yes, Paul Sullivan.

Defense counsel: What did they do?

Duffy: They typically interview people.

Defense counsel: No. What did they do?

Duffy: I don't know.

***

> Defense counsel:  So banks – when banks find in their system fraud, they're obligated to send it to the FBI.  You know that?
>
> Duffy:  Yes.
>
> Defense counsel:  Did this complaint that you made about Mr. Constantinou go to the FBI?
>
> Duffy:  I would not have any knowledge of that.

Tr. 527.  This cross-examination suggests that Duffy, like Murphy, did not know the outcome of the internal audit.  Even if Duffy or Murphy did, in fact, know that the internal audit concluded that Constantinou had not committed any wrongdoing, based on their testimony counsel could have reasonably assumed they did not know.  In any event, trial counsel did elicit testimony that neither Duffy nor Murphy was aware of any reports made to the FBI, which suggests that Constantinou was not found guilty of wrongdoing.  Constantinou does not address trial counsel's cross examinations on the subject, and thus has failed to provide the court with any basis upon which to find that trial counsel's cross examination was so inadequate as to fall outside "the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.

Second, with respect to trial counsel's failure to call Tavarozzi, Constantinou has also failed to plausibly allege ineffective assistance of counsel.  Trial counsel enjoys a presumption of reasonableness with respect to decisions about whether to call witnesses.  See supra Section III(C)(1).  The facts here present no exception to that general presumption.  Even assuming that Tavarozzi knew about the outcome of the internal audit, and assuming that the outcome cleared Constantinou of wrongdoing, it is hardly objectively unreasonable for defense counsel to decide not to call a witness to testify about an investigation of his client's fraud: calling Tavarozzi, Murphy's supervisor, to ask him about the outcome of the internal audit would have opened the door for the

government to cross-examine Tavarozzi about the fraudulent mortgages, Constantinou's work performance, and Constantinou's resignation; it would have refreshed the testimony about the internal audit in the jurors' minds; and it would have given the government an opportunity to, once again, delve into all the reasons why GMAC decided to conduct an audit in the first place. On the backdrop of the presumption that decisions about whether to call witnesses is ordinarily within the range of reasonable performance, Constantinou has failed to plausibly allege that trial counsel was objectively unreasonable for failing to call Tavarozzi to testify about the outcome of the internal audit.

The final shortcoming of Constantinou's argument with respect to the performance prong of this claim is that Constantinou has not presented any specific facts to show that trial counsel was, or should have been, aware of the outcome of the internal audit. Given that Constantinou resigned before the internal audit concluded, it is far from obvious that Constantinou himself would have learned the outcome, nor has Constantinou suggested any other basis on which trial counsel should have learned what the outcome was, or alleged that trial counsel was aware of it. In the absence of a reliable basis on which counsel should have known the outcome of the audit, it is perfectly reasonable for counsel to forego questioning witnesses on a subject that could well have been damaging to his client.

Constantinou has further failed to plausibly allege that, had trial counsel elicited from Murphy, Duffy, or Tavarozzi that the audit found no wrongdoing, there is a reasonable probability that the outcome of the trial would have been different.

Neither Murphy nor Duffy testified that the audit found fault on Constantinou's part, or even implied that they knew what the outcome of the audit was. Instead, their testimony was cabined to the suspicious patterns identified in Constantinou's loans, and the fact that Constantinou resigned before the matter was resolved. Given the nature of Murphy's and Duffy's testimony, it is doubtful that introducing evidence of the outcome "would have greatly reduced the prejudicial impact" of Murphy's and Duffy's testimony as Constantinou asserts. Mot. to Vacate at 8. Indeed, the government proved at trial that a number of GMAC loans were fraudulent. Thus, to the extent that the internal audit was inconsistent with that proof, it is more likely than GMAC's internal conclusion was simply erroneous.

In sum, on the topic of the internal audit at GMAC, Constantinou has failed to plausibly allege that trial counsel was objectively unreasonable or that Constantinou was prejudiced as a result.

### 4. Failure to Call an Expert Witness on Loan Processing

In his Motion to Vacate, Constantinou asserts that, "based on his clearly defined role as a loan officer, he did not participate in fraud, because it was not his role to verify lenders' information." Mot. to Vacate at 10. He argues that, had trial counsel called an expert witness, the expert "would have aided the jury in its determination that, given the complex nature of the overall process, a reasonable doubt exists as to whether a loan officer has the capability to pass fraud upon underwriters." Id.

"[C]ounsel's decision as to 'whether to call specific witnesses . . . is ordinarily not viewed as a lapse in professional representation.'" Best, 219 F.3d at 201 (quoting Schmidt, 105 F.3d at 90); see supra Section III(C)(1). On top of that general rule, Constantinou has further failed to plausibly allege that counsel's performance was

objectively unreasonable because Constantinou has not identified any expert who was available at the time of trial and who would have offered testimony consistent with his theory that, in essence, loan originators cannot be guilty of mortgage fraud.  See United States v. Stegawski, 687 Fed. App'x 509, 513 (6th Cir. 2017) (counsel was not ineffective for failing to call an expert witness where "there was not then, and is not now, an identified" expert who would have offered helpful testimony).

In addition, Constantinou's trial counsel elicited testimony tending to show that loan originators are not responsible for verifying lender information.  For example, during the testimony of Lanisa Jenkins, a government witness with experience in a number of relevant banking positions, including as an auditor of closed loans, the following occurred during cross examination:

> Defense counsel:  . . . [Y]ou do know generally what the duties of the loan originator are, right?
>
> Jenkins:  Yes.
>
> Defense counsel:  And his job, as I understand it and correct me if I'm wrong, is to collect the information that the borrower gives him, correct?
>
> Jenkins:  Yes.
>
> Defense counsel:  He writes it down on a form, correct?
>
> Jenkins:  Correct.
>
> ***
>
> Defense counsel:   And so if a fellow sits down with Mr. Constantinou and lies to him, he doesn't do – he writes down what the person says, correct?
>
> Jenkins:  Correct.
>
> Defense counsel:  If he says, I own four properties worth five million, Mr. Constantinou writes it down, correct?

Jenkins:  Correct.

Defense counsel:  And he collects all this information on a form and then sends it over to the loan processor, correct?

Jenkins:  Correct.

Defense counsel:  I didn't hear you say too much about the loan processor on direct examination.  What's the role of the loan processor?

Jenkins:  Basically, the loan processor receives the information and packages together and inputs the information into the computer.

Defense counsel:  So the loan processor, would it be fair to say, checks the information that's on the form?

Jenkins:  No.

Defense counsel:  Who orders the credit report?

Jenkins:  Sometimes the loan officer orders the credit report at the time they take the loan application.

Defense counsel:  And so if the loan processor sees something fishy on that loan application, is he authorized to do something about it?

Jenkins:  That's typically not a loan processor's position, no.

Defense counsel:  So here comes Mr. Constantinou, goes to the loan processor.  Then it goes to the underwriter, right?

Jenkins:  Correct.

Defense counsel:  And the underwriter's position is the person who really scrutinizes what's going on here, correct?

Jenkins:  Correct.

Defense counsel:  The underwriter is the person who has the authority to say the loan is approved or the loan is not approved, correct?

Jenkins:  Correct.

Defense counsel:  Mr. Constantinou does not have that authority, correct?

Jenkins:  Correct.

Tr. at 185–88.  This is only an excerpt of a lengthy cross-examination of Jenkins in which trial counsel elicited—from a government witness—extensive details of the mortgage transaction process, all of which tended to show that, as a loan originator, Constantinou had little to no responsibility for verifying the accuracy of the information in loan applications.  <u>See</u> Tr. at 185–93.  This testimony evidently did not persuade the jury that Constantinou could not have committed fraud.  Constantinou offers no basis for the court to conclude that testimony of an expert would have been more effective than the testimony he elicited from Jenkins, among others, and the court knows of none.

Therefore, the court concludes that Constantinou has not plausibly alleged either that trial counsel's failure to call an expert witness was objectively unreasonable or that the absence of expert testimony was prejudicial.

### 5. Failure to Elicit Specific Testimony from Defense Witness Eric Aydar

At trial, the defense called appraiser Eric Aydar, who testified that Levitin attempted to get him to alter his appraisals and that he did not comply with Levitin's requests.  <u>See</u> Tr. at 1615–16.  Constantinou argues that counsel was ineffective for failing to "ask Mr. Aydar specifically whether Mr. Constantinou was aware of any fraud in the 125 Spring Street sale, which was one of the three properties that closed on 12/29/06."  Mot. to Vacate at 10.

However, if trial counsel had questioned Aydar about Constantinou's state of mind, those questions would have violated Federal Rule of Evidence 602, which requires that witnesses testify "only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  What Constantinou was

or was not aware of is clearly a question of which only Constantinou himself has personal knowledge.[6]  It is likely that, if trial counsel had asked Aydar about Constantinou's state of mind, the government would have objected and the court would have sustained the objection.  In any event, it is clearly within the "within the wide range of reasonable professional assistance" for trial counsel to comply with the Federal Rules of Evidence.  Strickland, 466 U.S. at 689.

Constantinou also asserts that, "[h]ad trial counsel questioned Mr. Aydar about [the appraisal of 125 Spring Street], Mr. Aydar would have testified specifically that the appraisal of 125 Spring Street was legitimate and that it accurately revealed vacancies in the property."  Mot. to Vacate at 10.

Aydar's testimony on cross examination casts serious doubt on this assertion.  In response to questions by the government, Aydar testified that he did not remember the identity of any of the buyers in the transactions involving Levitin, nor did he remember what street they were on, or whether corrections officers were the borrowers.  See Tr. at 1616–17.  He did not recall who Levitin was until his recollection was refreshed during direct examination, see id. at 1615, and, on cross, Aydar testified that he did not know whether Levitin was a borrower, property manager, or real estate agent, see id. at 1618–19.

Nevertheless, even assuming that Aydar would have testified as Constantinou asserts, Constantinou has failed to plausibly allege that he was prejudiced in the absence of that specific testimony.  Aydar did testify on direct examination that all of his

_____

[6] Obviously, if Aydar had told Constantinou that the appraisal was fraudulent, Aydar could have testified to that.  Presumably, Constantinou is not complaining that such testimony was not elicited.

appraisals accurately reflected vacancies in the properties he was appraising and that he never complied with Levitin's requests to falsify information.  Tr. at 1615–16. Constantinou has not offered any argument as to why specific testimony would have necessarily been more effective than the blanket denial of fraud to which Aydar testified. In addition, 125 Spring Street was only one of many properties with respect to which the government offered evidence of fraud.  Therefore, even if Aydar's otherwise poor recollection of the Levitin properties was crystal clear with respect to 125 Spring Street, it remains highly implausible that this would have altered the outcome of Constantinou's trial.

For the foregoing reasons, Constantinou has failed to plausibly allege either that trial counsel's performance was deficient, or that Constantinou was prejudiced by trial counsel's failure to elicit specific testimony from Aydar.

### 6.  Failure to Argue Effectively in Closing

Constantinou acknowledges that trial counsel entered "a substantial number of documents" showing that Constantinou ordered legitimate appraisals.  Mot. to Vacate at 11.  However, Constantinou argues that trial counsel was ineffective during closing argument for failing to "point out, one by one, that the appraisals in these properties properly reflected the vacancies that existed."  Id.

Ineffective assistance claims face a particularly high bar in the closing argument context, as the Supreme Court has held that "deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage."  Yarborough v. Gentry, 540 U.S. 1, 6 (2003). Indeed, the Supreme Court has held that, in some cases, it is not ineffective for counsel

to waive the right to make a closing argument altogether.  See Bell v. Cone, 535 U.S. 685, 701–02 (2002).

Constantinou's argument falls well below this high bar.  Contrary to Constantinou's unsupported assertion, it is far from clear that it would have been more effective to walk through the appraisals for each property "one by one," as opposed to arguing about all the properties as a whole, as Constantinou asserts.  Mot. to Vacate at 11.  Trial counsel could reasonably conclude that the jury would be bored or confused by a more granular approach, particularly given that the exhibits themselves were admitted one by one during the evidence portion of the trial.  That this is a reasonable strategic choice is clear from the very fact that closing argument is often called "summation."  See Closing Argument, Black's Law Dictionary (10th ed. 2014) (noting that "closing argument" is also known as "jury summation; summing up; summation").

In short, Constantinou has failed to plausibly allege that counsel erred in arguing as he did, much less than he committed constitutional error that prejudiced Constantinou.

7.  Failure to Present Evidence that GMAC Defended Against
Accusations of Fraud by Freddie Mac

In his Motion to Vacate, Constantinou asserts that "Freddie Mac purchased GMAC loans completed by Constantinou; that when Freddie Mac's auditors reviewed the files they suspected fraud; that Freddie Mac confronted GMAC about the fraud; and that GMAC responded by defending against Freddie Mac's contentions that there was fraud."  Mot. to Vacate at 11.

Yet again, Constantinou has not alleged any detailed facts to support this assertion, nor has he described the identity of witnesses or the character of

documentary evidence that trial counsel should have presented at trial. However, even taking all of these facts as true, and assuming that they could have been proved at trial, and assuming that trial counsel knew or should have known about the communications between Freddie Mac and GMAC, Constantinou has still failed to plausibly allege ineffective assistance of counsel. In order for trial counsel to prove that GMAC defended Constantinou's loans, it would have first been necessary to present evidence that yet another entity was suspicious of Constantinou's work. If GMAC did defend the legitimacy of the loans against Freddie Mac's accusations, that would hardly be clearly exculpatory evidence, since GMAC had an incentive to defend its own loans against accusations of fraud.

It is the view of this court that the absence of such evidence more likely reflects the strengths, as opposed to the weaknesses, of trial counsel. In any event, this claim, too, fails to plausibly state a claim of ineffectiveness on either the performance or the prejudice prong.

### 8. Failure to Present Evidence that GMAC Participated in Legitimate Agreements with Outside Lenders

At trial, as described above, part of the government's case against Constantinou involved showing, through documentary evidence and the testimony of forensic accountant Ben Almodovar, that Constantinou received kickbacks from unindicted co-conspirator Richard Sabrowske in return for referring fraudulent mortgages to him. See supra Section III(C)(1). In his Motion to Vacate, Constantinou asserts that trial counsel was ineffective for failing to "present evidence that GMAC participated in legitimate agreements with other lenders, such that GMAC loan officers could refer loans . . . and GMAC would receive a partial commission." Mot. to Vacate at 11. Constantinou

asserts that, if trial counsel had presented evidence on this issue, it "would have refuted the Government's contention that Mr. Constantinou was forbidden to secure additional loans." Id. at 11–12.

Assuming, for the sake of argument, that (1) this is an accurate description of a GMAC policy, (2) trial counsel knew or should have known about this policy, (3) witnesses were available who would have testified to this, and (4) this evidence would have refuted the government's case as Constantinou asserts, Constantinou has still failed to plausibly allege that trial counsel acted objectively unreasonably in declining to present this evidence and that this action was prejudicial. A policy at GMAC permitting referral of loans to other lenders for which GMAC would receive a partial commission would in no way diminish the government's evidence that Constantinou was receiving kickbacks for these referrals directly from Sabrowske, which kickbacks he funneled through his daughter's bank account or a bank account set up under an alias, and then ultimately used to pay private credit card bills. Constantinou has thus failed to plausibly allege either that trial counsel acted objectively unreasonably in failing to elicit this evidence or that, had he done so, there is a reasonable probability that the outcome of trial would have been different.

> 9. Failure to Present Evidence that Levitin Stopped Working with Constantinou Because Constantinou Refused to Use a Certain Appraiser

In his Motion to Vacate, Constantinou asserts that Levitin testified "that he stopped working with Mr. Constantinou because Mr. Constantinou was too expensive." Mot. to Vacate at 12. Constantinou asserts that this is false, that Levitin actually stopped working with him because Constantinou refused to use a certain appraiser, and that trial counsel was ineffective for failing to rebut Levitin's testimony. Id. Constantinou

does not cite to the record to that Levitin testified "that he stopped working with Mr. Constantinou because Mr. Constantinou was too expensive," and the court is unaware of any such testimony by Levitin. However, Levitin did indicate that he was unhappy with Constantinou's fees, and testified that Charles Lesser, another loan officer, charged less:

> Government: Now, you testified last week that you had complained to Mr. Constantinou and Mr. Sabrowske about their fees.
>
> Levitin: Yes.
>
> Government: Can you give the jury an idea of how much fees Mr. Constantinou and Mr. Sabrowske were charging in these deals?
>
> Levitin: Well, each deal would be different, especially if it is a larger loan amount, it would be a lot more.
>
> Government: Can you give them an estimate or percentage or numbers?
>
> Levitin: I don't recall exactly what it was. I just remember it was either a point or two. Like, 1 or 2 percent higher than, like, Charles Lesser or someone else was able to get.
>
> Government: A point or two is, what is a point?
>
> Levitin: A point is 1 percent of the loan amount.
>
> Government: Now, did Mr. Constantinou and Mr. Sabrowske continue to obtain all the loans for the scheme?
>
> Levitin: No.
>
> Government: Did someone else obtain loans as part of the scheme?
>
> Levitin: Yes.
>
> Government: Who is that?
>
> Levitin: Charles Lesser.

***

> Government: After Mr. Lesser started working on these loans in early 2007, did Mr. Constantinou and Mr. Sabrowske continue to work on loans as part of the scheme?

> Levitin: Yes.

> Government: And so, they were working on deals in the same time period?

> Levitin: Yes.

Tr. at 743–46. In sum, it was Levitin's testimony that he was unhappy about the fees charged by both Constantinou and Sabrowske, but continued to work with them anyway.

Contantinou has not alleged any reason why it was either objectively unreasonable or prejudicial that trial counsel did not introduce evidence to show that Constantinou refused to "use a certain appraiser." Mot. to Vacate at 12. Constantinou has failed to provide any details about the appraiser issue, including who Levitin wanted Constantinou to use, why Constantinou did not want to use that appraiser, or even why the distinction between the appraiser conflict and the fee conflict is relevant. Constantinou has also failed to suggest which witnesses or what evidence should have been introduced at trial on this subject. Given that Levitin did not testify that his relationship with Constantinou ended for any reason, the court cannot conjure up any reason why it would have been helpful to Constantinou if trial counsel had introduced a conflict about an appraiser. Therefore, the court concludes that Constantinou has failed to plausibly allege ineffective assistance of counsel on this basis.

> 10. Failure to Secure Documentary Evidence that Levitin Continued to Work as a Realtor After Being Convicted of Fraud

In a one-sentence claim in his Motion to Vacate, Constantinou asserts simply, "Trial counsel failed timely to secure documentary evidence that Mr. Levitin continued to work as a Realtor after he was convicted of fraud in the District Court." Mot. to Vacate at 12. In a lengthy segment of his cross-examination of Levitin at trial, trial counsel elicited testimony from Levitin that he had continued to manage real estate after entering a guilty plea in connection with the mortgage fraud conspiracy at issue in Constantinou's case. <u>See</u> Tr. at 773–78. Although Levitin denied that he performed work other than property management, he did admit that he was still licensed as a real estate agent and the government was permitting him to work as a real estate agent. <u>See</u> <u>id.</u> at 776. Trial counsel even elicited testimony that Levitin's real estate license needed to be renewed annually, and that Levitin did not know whether that form asked about criminal convictions because he did not "necessarily" read the form before signing it. <u>Id.</u> at 777.

Trial counsel thus questioned Levitin extensively on this issue, and elicited testimony that was favorable to the defense in the process. Constantinou has provided no basis to find that cumulative documentary evidence would have been helpful to his defense, much less helpful enough to create a reasonable probability of a different outcome. Constantinou has therefore failed to plausibly allege ineffective assistance of counsel on this claim.

11. Failure to Call Witnesses to Testify that Constantinou Refused to Close on a Fraudulent Loan

In his Motion to Vacate, Constantinou asserts that trial counsel was ineffective for failing to call two witnesses to testify that Constantinou refused to close on a fraudulent loan sought by Reginald Powell. <u>See</u> Mot. to Vacate at 12–13. Specifically,

Constantinou argues that counsel should have called Judith Buckley, an underwriter, and Reginald Powell, a loan applicant whose loan Constantinou refused to close on. Once again, Constantinou has failed to plausibly allege ineffective assistance of counsel.

First, as analyzed more comprehensively above, trial counsel's decisions with respect to calling witnesses are presumptively reasonable.  <u>See</u> <u>supra</u> Section III(C)(1).

Second, Constantinou has not articulated—and the court cannot fathom—how a single instance of Constantinou's non-fraudulent behavior would create a reasonable probability of a different outcome in a case where Constantinou was alleged to have conspired to commit fraud in at least twenty mortgage transactions.  Although Powell was apparently affiliated with the conspiracy in some way, his name came up only in passing as one of several corrections officers who co-conspirator Attorney Weisman represented.  <u>See</u> Tr. at 312.  None of the evidence adduced at trial tied Constantinou to fraud involving Powell, and Constantinou has not even attempted to suggest why this claim satisfies either the performance or prejudice prongs of the <u>Strickland</u> standard.

Third, in light of Constantinou's theory of the case at trial—namely, that as a loan originator he could not have committed fraud—introducing testimony that Constantinou suspected fraud and effectively blocked GMAC from closing on a loan because of his suspicions would have tended to undermine Constantinou's own defense theory.

For the above reasons, Constantinou has failed to plausibly allege ineffective assistance of counsel on the claim that counsel should have called Judith Buckley and Reginald Powell.

12. Failure to Call and Question Witnesses about Levitin's Multiple Conspiracies

In his Motion to Vacate, Constantinou asserts that trial counsel was ineffective for failing to call Robert Letsky or Charles Lesser to testify about "the multiple conspiracies run by Mr. Levitin" and for failing to cross-examine Attorney Weisman about these conspiracies. Mot. to Vacate at 13–14.

Once again, Constantinou has failed to allege any facts or details to support his view that "the Government's proof was of multiple conspiracies, rather than the single conspiracy alleged in the indictment." Id. Constantinou has not even offered any details as to who Letsky and Lesser are, beyond the bald assertions that they "had personal knowledge of Mr. Levitin's various conspiracies."[7] Id. at 13. On top of the presumption that counsel's decisions with respect to both cross-examination and calling of witnesses is reasonable, see supra Sections III(C)(1) and (3), Constantinou's claims with respect to Letsky and Lesser are further weakened in light of the likelihood that anyone with knowledge of multiple conspiracies gained that knowledge through participation in at least one conspiracy. Such a relationship to the conspiracy or conspiracies at issue both diminishes the credibility of the witnesses and creates the possibility that either Letsky or Lesser may have exercise their Fifth Amendment right not to testify if called.

However, even assuming that these witnesses could have and would have testified that multiple conspiracies existed, Constantinou has not plausibly alleged that counsel was ineffective for declining to pursue this line of questioning with Weisman and declining to call Letsky or Lesser.

---

[7] Based on Levitin's testimony at trial, Charles Lesser was a loan officer whose role in the conspiracy was similar to that of Constantinou and Sabrowske, but who got involved later than the other two. See Tr. at 743–46; see also supra Section III(C)(9).

First, Constantinou's theory at trial was that, although fraud was committed, he was not a knowledgeable or willing participant in the fraud. Constantinou testified on his own behalf, and his testimony was that he was not aware of any fraud involved in the relevant transactions. See, e.g., Tr. at 1712–13. Although a multiple-conspiracies defense is not directly in conflict with this theory—multiple conspiracies could have existed, none of which involved Constantinou—a defense attorney could reasonably conclude that such a defense would confuse the jury and raise an inference that Constantinou had committed fraud in a conspiracy.

Second, Constantinou has failed to point to a single source from which trial counsel should have learned about multiple conspiracies. While Letsky and Lesser, for example, may have been capable of testifying about the multiple conspiracies, Constantinou has not provided any reason why counsel should have talked to either of them in the first place. Frankly, if Constantinou himself is the source (that is, if he told his trial counsel that there were multiple conspiracies based on his own personal knowledge of those conspiracies), then his trial testimony was perjurious and trial counsel suborned perjury by permitting him to testify as he did. This has not been alleged, much less supported. Because he has not alleged that trial counsel was, or should have been, aware of multiple conspiracies, Constantinou has failed to plausibly allege that counsel acted objectively unreasonably in failing to pursue this defense.

With respect to the prejudice prong of the Strickland analysis, Constantinou has failed to plausibly allege prejudice because he has provided no detail whatsoever to support the multiple-conspiracies defense. Although failure to raise the multiple-conspiracies defense would be prejudicial, without question, if there was strong

evidence of multiple conspiracies, Constantinou has provided no details whatsoever about the alleged multiple conspiracies. The vague, conclusory allegation that there were multiple conspiracies is inadequate to satisfy the requirement that a section 2255 motion state "detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief." Gonzalez, 722 F.3d at 131.

Therefore, the court concludes that Constantinou has failed to plausibly allege a claim of ineffective assistance of trial counsel with respect to the multiple-conspiracies defense.

### 13. Appellate Counsel's Failure to Raise the Claim that the Government's Proof Was of Multiple Conspiracies

In addition to his claim that trial counsel should have presented evidence that there were multiple conspiracies, as opposed to the single conspiracy charged in the Indictment, Constantinou raises a substantive challenge to his conviction on this basis. See Mot. to Vacate at 14. In the alternative, he argues that, if this issue was waived when it was not raised on appeal, appellate counsel was ineffective for failing to raise this issue on appeal. See id.

First, the court concludes that the substantive claim was waived on direct appeal. A claim may not be raised for the first time in a section 2255 motion unless the movant can show "cause" for not raising the claim previously and "prejudice" resulting from the default. Bousley v. United States, 523 U.S. 614, 622 (1998). Constantinou has made no attempt to meet this standard. Where a claim is procedurally defaulted, the court need not reach the merits of the claim. See Napoli v. United States, 45 F.3d 680, 682 (2d Cir. 1995).

Second, Constantinou has failed to plausibly allege that appellate counsel acted objectively unreasonably in failing to raise this issue on appeal. The Supreme Court has held that appellate counsel need not "raise every nonfrivolous issue" on appeal. Jones v. Barnes, 463 U.S. 745, 750 (1983). Instead, it is a mark of effective representation to "winnow[ ] out weaker arguments on appeal and focus[ ] on one central issue if possible, or at most on a few key issues." Id. at 751–52.

Third, Constantinou has failed to assert any basis on which appellate counsel should have been aware of facts to support a multiple-conspiracies argument. See supra Section III(C)(12).

Finally, Constantinou has not even alleged any facts from which the court could find a plausible claim of multiple conspiracies, much less find that that it was objectively unreasonable for counsel not to raise this issue on appeal. See id.

The court concludes that Constantinou has failed to plausibly allege ineffective assistance of appellate counsel.

## IV.    CONCLUSION

Constantinou has failed to plausibly allege that either trial counsel or appellate counsel were ineffective. Puglisi, 586 F.3d at 213. In addition, there are no material facts in dispute: taking all of Constantinou's factual assertions as true, Constantinou's claims still fail. See Gonzalez, 722 F.3d at 131. For these reasons, the court exercises its discretion to **DENY** Constantinou's request for a hearing.

Furthermore, for the reasons articulated above, the court **DENIES** Constantinou's Motion to Amend (Doc. No. 41) and **DENIES** Constantinou's Motion to Vacate, Set Aside, or Correct Sentence (Doc. No. 25).

Finally, because the petitioner has not made a "substantial showing" of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

Dated at New Haven, Connecticut this 17th day of November, 2017.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge